```
UNITED STATES DISTRICT COURT
-------------------------------x
SEA METROPOLITAN S.A.,

              Petitioner,

        -against-                    MEMORANDUM AND ORDER
                                       13-CV-1521 (DRH)(AKT)
DGM COMMODITIES CORP., f/k/a
D&N COMMODITIES INC., f/k/a
D&N COM., INC., DAVID ELUA
a/k/a DAVID ELUASHVILI, DGM
HOLDING CORP., DAVINI REALITY
CORP., and ABC CORP. 1-5,

              Respondents.
-------------------------------x
A P P E A R A N C E S:

For Plaintiff:
    Freehill Hogan & Mahar LLP
    80 Pine Street - 24th Floor
    New York, New York 10005
       By: Michael E. Unger, Esq.
           Susan Lee, Esq.

For Defendants:
    Margolis & Tisman LLP
    280 Madison Avenue - 5th Floor
    New York, New York 10016
       By: James F. Parver, Esq.
           Stephen E. Tisman, Esq.
```

HURLEY, Senior District Judge

Presently before the Court is the application of petitioner, Sea Metropolitan, S.A. ("SMSA" or "petitioner"), for an order (a) granting a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, prohibiting DGM Commodities Corporation ("DGM Commodities"), David Elua ("Elua"), DGM Holding Corporation ("DGM Holding") and Davini Reality LLC ("Davini") (collectively respondents) "from selling, transferring, or otherwise disposing of property" until such time

as the multi-million dollar judgment SMSA has against DGM Commodities has been satisfied, and (b) "granting pre-judgment attachment, pursuant to Rule 64 and N.Y.C.P.L.R. Article 62, over all property in which each Respondent herein has an interest up to [the amount of the judgment]." (Pet'r's July 19, 2013 Reply Mem. at 1.)

BACKGROUND

"On or about October 17, 2007, [SMSA], as owner of the . . . vessel ANDRA, entered into a maritime contract . . . with DGM Commodities, as charterer, for the carriage of a full cargo of frozen chicken parts from the U.S. Gulf Coast to St. Petersburg, Russia." (See Michael E. Unger ("Unger") Affirm. in Supp., inter alia, of Sealing Order ¶ 13.) Due to "DGM Commodities's breach of the Charter Party, . . . arbitration proceedings [were commenced] in London in or around August of 2008." Id. ¶ 17. "In November 2011, the matter proceeded to a seven day hearing conducted before a three-member panel in London, at which David Elua, in his capacity as President and 100% beneficial owner of DGM Commodities, appeared and testified on behalf of DGM Commodities." Id. ¶ 18. Upon the conclusion of the arbitration proceeding, "the panel issued a principal arbitration award, holding in favor of [SMSA] on its demurrage claims against DGM Commodities and award[ed] the amount of $3,605,630.00 plus interest thereon from September 1, 2008 until

the date of payment." Id. ¶ 19. That award was appealed to the English High Court which, by decision dated July 18, 2012, found in favor of SMSA and directed DGM Commodities to pay "attorneys' fees and costs incurred in connection with the appeal." Id. ¶ 20.

After various efforts by SMSA to obtain payment of the sums awarded proved unsuccessful, SMSA commenced an action in the United States District Court for the Eastern District of New York "to obtain recognition and enforcement of the London arbitral award and the English High Court cost order as a judgment of the U. S. District Court." Id. ¶ 23. As a result, the Honorable Sandra J. Feuerstein entered judgment in favor of SMSA against DGM Commodities in the amount of $4,358,850.59 on January 24, 2013. Id. ¶ 24. When that judgment failed to prod or otherwise produce payment, SMSA started a second federal action, this one before me, seeking the relief mentioned above.[1]

A temporary restraining order was issued on June 4,

---

[1] In addition to the judgment entered by Judge Feurstein, "the [arbitral] panel issued a separate arbitration award as to costs dated February 20, 2013 . . . directing DGM Commodities to pay [SMSA an] additional sum," which DGM Commodities has failed or otherwise refused to pay. Unger Affirm. ¶ 36-37. This award has not yet been entered by a U.S. court, but petitioner contends, and respondents do not contest may be enforced here pursuant to the Convention for the Recognition and Enforcement of Foreign Arbitral Awards codified at 9 U.S.C. § 201 et seq. See Supp. Affirm. of Unger ¶ 8. Since neither party has distinguished between the judgment entered by Judge Feurstein and the cost award, this opinion's discussion of "the judgment" includes both items.

2013, which enjoined, not only the judgment debtor DGM Commodities, but also the other named respondents from, "except in the ordinary course of business, disposing of, paying over, selling, transferring, conveying, encumbering, secreting or removing any real or personal tangible or intangible property" in which any of them have an interest pending the return date.  June 4, 2013 O/T/S/C at 7.  The return date was extended, along with the temporary restraining order by agreement of the parties until July 22, 2013 when the preliminary injunction hearing was commenced.  The hearing consumed that day, as well as the better part of July 23, 2013.  Most of the evidence consisted of various Declarations; in addition, respondent Elua testified as did Nikolai Pirtskhalaichvili ("Nikolai").[2]

      As alleged in the Amended Verified Petition, and as developed during the course of the hearing, petitioner claims that Elua controls each of the respondent entities and that he utilized that domination to essentially render DGM Commodities judgment-proof.  This was done, petitioner proffers, by Elua, inter alia, winding down the debtor-corporation's activities in 2009 and diverting what would have been its business to several

---

[2] Nikolai made personal loans to DGM Commodities towards "the end of 2006 [and] the very beginning of 2007," (July 2013 Hearing Transcript ("Tr.") at 227), and apparently also was provided with some decision making discretion by Elua.  For obvious reasons, the parties agreed during the hearing to refer to this witness solely by his first name.

other Elua controlled companies, including "Commodities International." See Am. Verified Compl. ¶ 96.

## APPLICABLE LAW

Preliminary Injunction

For a preliminary injunction to properly issue, a movant must establish "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." My Web Grocer, LLC v. Hometown Info Inc., 375 F.3d 190, 192 (2d Cir. 2004)(internal quotation marks omitted).

Notwithstanding the general rule that there is no irreparable harm where an aggrieved party seeks solely a monetary award, "a preliminary injunction is appropriate to prevent a defendant from taking actions to frustrate a judgment." See Ally Bank v. Reimer, 2010 WL 446025, at *5 (E.D.N.Y. Jan. 29, 2010)(internal quotation marks omitted). Here, DGM Commodities has repeatedly repelled SMSA's efforts to recover under the subject judgment and, in the process, has, through Elua, diverted assets from the debtor-corporation. Parenthetically, the motivation for that recalcitrance may be traceable to Elua's seeming belief, as intimated during his hearing testimony, that the arbitration award was unjustly entered. See Tr. at 141-143.

In any event, if the present dispute was limited to just the judgment debtor and the judgment creditor, the Court's job would be straightforward for SMSA has clearly satisfied the irreparable injury element of its cause of action for injunctive relief against that respondent.           Similarly, as between SMSA and DGM Commodities, the proof comfortably satisfies the likelihood of success element;  SMSA merely wants the judgment in its favor to be paid.[3]  However, the main thrust of the present application is to recover the amount of the judgment from one or more of the non-DGM Commodities respondents, and that is not a simple task.  Towards that end, petitioner asks the Court to pierce the corporate veil under an alter ego theory.[4]

Order of Attachment

Under Federal Rule of Civil Procedure 64 "every remedy is available that, under the law of the state where the court is located, [there exists a provision] for seizing . . . property to secure satisfaction of the potential judgment."  Fed. R. Civ. P. 64(a).  "The remedies available under this rule include . . . .

---

[3] Satisfaction of the likelihood of success element obviates the need to address the presence or absence of a sufficiently serious question going to the merits and the balance of hardship elements which are stated in the disjunctive to the likelihood of success standard.

[4] As explained in <u>Bravado International Group Merchandising Services, Inc. v. Ninna, Inc.</u>, 655 F. Supp. 2d 177, 194 (E.D.N.Y. 2009), "alter ego liability . . . is also referred to as 'piercing the corporate veil.'"

attachment."  Fed. R. Civ. P. 64(b).

New York CPLR § 6201 provides in pertinent part that "[a]n order of attachment may be granted in any action . . . when . . . 5. the cause of action is based on a judgment, decree or order of a court of the United States or any other court which is entitled to full faith and credit in this state . . . ."  A juxtapositioning of the language of § 6201(5) with the facts at hand, indicates that attachment is appropriate against property of the judgment debtor, DGM Commodities.[5]

But here again, the primary focus of petitioner's current attempt to collect on the judgment targets the non-DGM Commodities respondents.

Alter Ego

For petitioner to prevail with respect to its request for a preliminary injunction and for an order of attachment against DGM Holding, Davini, and/or Elua, it must demonstrate that such entity or entities, or Elua individually, is an alter ego of DGM Commodities.

By way of reviewing some basic principles, a "corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owner. Because a principal purpose for organizing a corporation is to

---

[5] DGM Commodities has not appeared in this action and petitioner is in the process of seeking a default judgment against that respondent.

permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." Oriental Commercial and Shipping Co. v. Rosseel, 702 F. Supp. 1005, 1018 (S.D.N.Y. 1988)(citation omitted). However, "when a corporation is used by an individual to accomplish his own and not the corporation's business, such a controlling shareholder may be held liable for the corporation's commercial dealings . . . ." Bravado International, 655 F. Supp. 2d at 194.[6]

"The critical question is whether the corporation is a 'shell' being used by the individual shareholders to advance their own 'purely personal rather than corporate ends.' The question of 'whether the corporate veil should be pierced requires a fact specific inquiry; there are no bright line rules.'" Bravado International, 655 F. Supp. 2d at 194 (citations omitted). "The doctrine . . . is typically employed by a third-party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation. The

---

[6] In Bravado International, the court discussed scenarios under which a controlling shareholder may be held responsible for a corporate obligation. However, veil piercing may be employed not only to reach the assets of a controlling individual [such as arguably, Elua], but also other owner-controlled entities [such as, arguably, DGM Holding and Davini]. D. Klein & Son, Inc. v. Good Decisions, Inc., 147 Fed. App'x 195, 2005 WL 361674 at *2 (2d Cir. 2005).

concept is equitable in nature and assumes that the corporation itself is liable for the obligations sought to be imposed." Morris v. New York State Department of Taxation and Finance, 82 N.Y.2d 135, 141 (1993) (citation omitted).

Under federal law with respect to petitioner's preliminary injunction application[7] and under State law vis-a-vis its effort to obtain an order of attachment against Elua, DGM Holding and/or Davini,[8] the following two questions must be answered in the affirmative: (1) has the person or entity sought to be saddled with the corporate obligation "'exercised complete

---

[7] Under federal law, the issue is not free from doubt. See Oriental Commercial and Shipping, 702 F. Supp. at 1018-19; see generally, STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL § 3:4 (2013). Indeed, petitioner's counsel opined during his opening statement that, unlike the undisputed two part conjunctive rule in New York, either domination or fraud would suffice for federal purposes (Tr. at 11); the cite for that proposition is set forth in an earlier submission of his as Kirno Hill Corp. v. Holt, 618 F.2d 982 (2d Cir. 1980). (Pet'r's Mem. in Supp. of a TRO, at 3-4.) However, reference to Kirno Hill indicates that simply being the "sole owner" of a corporation is insufficient to "justify piercing the corporate veil" absent evidence that the owner used the "corporate form . . . primarily [to transact his own] personal business [and/or to promote] a fraudulent end." Id. at 985.

Here, Elua, as explained infra in the text, is the sole owner and, as such, necessarily exercises ultimate control over each of the respondent companies. That fact alone, however, cannot be deemed adequate to ignore those companies' legal independence. Something more, as explained in Kirno Hill, is needed. That "something more" calls for evidence linking Elua's domination to harm sustained by SMSA.

[8] Morris v. New York State Department of Taxation and Finance, 82 N.Y.2d 135, 141 (1993).

domination over the corporation with respect to the transaction at issue' and (2) that 'such domination was used to commit a fraud or wrong that injured . . . the party seeking to pierce the veil.'" D. Klein & Son, Inc. v. Good Decision, Inc., 147 Fed. App'x 195, 197 (2d Cir. Feb. 15, 2005)(Summary Order)(quoting Mag Portfolio Consult. Gmbh v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001).

With respect to the first question, i.e. the domination factor, the Second Circuit instructs in Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., that attention should be given to such considerations as:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

933 F.2d 131, 139 (2d Cir. 1991).

As to the second question or factor, "it may be satisfied either upon a showing of fraud or upon complete control . . . that leads to a wrong against third parties." <u>Two Kids From Queens, Inc. v. J & S Kidswear, Inc.</u>, 2010 WL 475319 at *3 (E.D.N.Y. Feb. 8, 2010), quoting <u>D. Klein & Son</u>, 147 Fed. App'x at 198.

In sum, petitioner's efforts to hold Elua, DGM Holding and/or Davini answerable for its judgment against DGM Commodities depends on the outcome of its alter ego claims.

<u>DISCUSSION</u>

<u>Petitioner has Established That Elua Dominated
and Controlled the Other Respondents, Thus
Satisfying the First Alter Ego Prong</u>

Elua is the sole owner of DGM Holding Corporation which, in turn owns DGM Commodities. Tr. at 67-68. Davini is a limited liability company owned by Elua, the business of which is ownership of the property at 49 Watermill Lane, Great Neck, New York. <u>Id.</u> at 69. Each of the respondents (other than Davini[9]), maintains an office at that address, as do several other Elua owned corporations, where all share the same cadre of employees, office equipment, a single listed telephone number and one fax line. <u>Id.</u> at 76, 77, 78, 80, 123 and 128. The rent on the shared quarters at 49 Watermill Lane is not divided among the occupants as one might expect; instead DGM Commodities paid it in

---

[9] Davini's registered office is at Elua's home. Tr. at 77.

full up to some unspecified period of time, after which the rental payments were switched to two other DGM Holding owned companies, namely Commodities International and Momaco International.  Id. at 79.  Moreover, DGM Commodities paid the payroll for the shared employees until 2009, and apparently still pays the telephone bill for 49 Watermill Lane.  Id. at 80.

Respondents' proof demonstrated, absent countervailing evidence, that each company complies with corporate formalities, has their own general ledgers, bylaws, bank accounts and faithfully files required tax returns.  Though such conduct suggests that the respondent companies, as well as other Elua controlled corporations, function at arms length consistent with their individual legal statuses, such clearly is not the case.  For example, Elua testified that if one of his companies needs either products or money to consummate a deal, a sister company will fill the void.  Id. at 91-92, 135.  Similar accommodations extended to a competitor would have been undertaken for a profit.  Id. at 135-36.  But for inter Elua-owned companies, the transfers are made gratuitously, with the sole documentation of the transactions consisting of simple general ledger entries.  Id. at 135-36.  Such items as, e.g., repayment schedules are nonexistent.

By way of concluding this point, petitioner has established for purposes of the present motions that Elua

exercises dominant control over each of the respondent companies and treats those companies as fungible entities intended to advance his personal interests. A prime, of many examples of this is found in the Global debacle to be discussed momentarily. Which is to say, petitioner has satisfied the first prong of the two part alter ego standard.

Petitioner Has Established the Fraud Component of
its Alter Ego Claim Against Elua

Petitioner's proof falls short of establishing that Davini or DGM Holding, either individually or in conjunction with Elua took any meaningful steps which caused injury to SMSA. Accordingly, petitioner's alter ego claims against these two respondents are found to be unavailing, thereby precluding the relief sought from being imposed against them.

The same may not be said as to Elua. Petitioner contends that Elua used his dominant control over DGM Commodities and non-respondent Commodities International[10] to divert in the neighborhood of $4,000,000 that was owed to the judgment debtor by Global Trading Resources Corporation ("Global") to Commodities

---

[10] Commodities International was originally owned by DGM Commodities and thereafter by DGM Holding (Tr. at 105-06), with the transfer of ownership being accomplished via an assignment – as reported by Elua — "effective January 1st of 2008." Tr. at 106. When petitioner's counsel suggested during cross examination that the assignment was back dated based on a document that Elua signed after that date listing continued ownership in DGM Commodities, Elua explained that was a "mistake." Id.

-13-

International. That was done, petitioner argues, in an effort to make DGM Commodities judgment proof. Based on the evidence presented, petitioner's rendition as to what occurred is more likely so than not so. That evidence includes: (1) a complaint filed in the Southern District of New York in December 2008 verified by Elua, as president of DGM Commodities, listing that corporation as the plaintiff in an action against Global claiming $4,020,219.50, (2) in paragraph 6 of that complaint, DGM Commodities identified "Global [as] the purchaser of shipments of frozen chicken parts from [DGM Commodities] that were loaded onboard the M/V SNOW DRIFT and M/V HAWK BAY,"[11] (3) a letter dated May 28, 2009 to Molly Henry – another attorney hired by SMSA with respect to its efforts to collect from DGM Commodities – in which DGM Commodities reported that Global's "debt to our company [was paid] on March 27, 2009"[12] (Henry Decl., ¶ 8 and Ex. D to that Decl.), and (4) information that, even though Elua averred in the S.D.N.Y. complaint that Global was indebted to DGM Commodities,[13] the monies due as a result of that clearly

---

[11] The S.D.N.Y. Complaint is attached as Exhibit A to the Declaration of Molly Henry ("Henry Decl.") submitted in support of the relief sought by petitioner.

[12] The payment of Global's indebtness was significant to Henry because she was trying to attach that indebtness on behalf of SMSA.

[13] Elua testified at the hearing that Commodities International, not DGM Commodities, was the seller to Global. Tr. at 102. Why he claimed otherwise in the S.D.N.Y. action was

-14-

identified transaction ended up in the coffers of Commodities International, not in the judgment debtor's hands. Henry Decl. ¶¶ 11, 12, 13, 14, 15, 16, 17 and 18.

The timing of the above events is telling. Elua knew no later than early in 2009, that SMSA was endeavoring to obtain security to protect its interest under the London arbitration. Tr. at 142. And in 2009, Elua started to wind down DGM Commodities' business, id. at 170, even though (1) its "volume of business . . . in 2008" was "218.6 million dollars," id. at 95, and (2) it enjoyed "a great reputation in the market and was known as a . . . large volume buyer of . . . frozen poultry." Id. at 130. The reasons advanced by Elua for the winding down operation were less than compelling. Id. at 81. Moreover, the post-2009 shift of major DGM Commodities customers to Commodities International lends further credence to petitioner's position.

In sum, petitioner has established the second prong of his alter ego claim against Elua.

Given That Petitioner has Established Both
Prongs of its Alter Ego Claim Against Elua,
Elua, Along With DGM Commodities is
Responsible for Indebtness Owed to SMSA

Having successfully invoked the alter ego doctrine against Elua, Elua now "stands in the shoes" of DGM Commodities.

---

not pursued during the hearing before me, although he did concoct a dubious tale in that regard during the London arbitration. See Decl. of Kevin Sach Submitted in Supp. at ¶ 12.

JSC Foreign Economic Ass'n Technostryexport v. Int'l Dev. And Trade Servs., 295 F. Supp. 2d 366, 384 (S.D.N.Y. 2003). No new or additional judgment is required to be entered against him as a precondition to the issuance of a preliminary injunction or order of attachment. Astrea United Investments, L.P. v. Onitiri, 1992 WL 346353, at * 3 (S.D.N.Y. Nov. 18, 1992) (finding that plaintiff could attach property interest of ship charterer's alter ego where judgment had been obtained only against charterer). For that reason, respondents' reliance on Grupo Mexicano v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999) is unavailing; petitioner is not seeking to enjoin a respondent from disposing of assets to protect a possible future judgment in contravention of the Grupo Mexicano holding because SMSA already has a judgment.

Petitioner is Entitled to Both a Preliminary
Injunction and Order of Attachment Against Elua,
as Well as DGM Commodities.

The lynchpin of petitioner's effort to render the non-DGM Commodities respondents also answerable under the January 24, 2013 judgment fell short of the mark as to Davini and DGM Holding[14] but successfully targeted Elua.

Considering the previously discussed standards for the issuance of a preliminary injunction under Fed. R. Civ. P. 65 and

---

[14] However, the attachment of Elua's assets includes his ownership interest in each of those two entities.

for an order of attachment under CPLR § 6201(5), in conjunction with the evidence produced at the hearing held on July 22nd and July 23rd, 2013, I find that petitioner is entitled to the relief requested as to both DGM Commodities and Elua.

## CONCLUSION

For the reasons provided, the relief sought by SMSA is granted as to DGM Commodities and Elua but otherwise denied.

Petitioner is directed to submit a proposed order consistent with this decision, on notice, on or before August 9, 2013. In the interim, the injunctive relief set forth in the now superceded TRO will be in effect – but only as to Elua and DGM Commodities – as part of this Order.

Petitioner's undertaking, as required by CPLR § 6212(b) and Fed. R. Civ. P. 65(c), is hereby fixed in the sum of $50,000.00.

SO ORDERED.

Dated: August 2, 2013
      Central Islip, New York

                                        _____/s/_____
                                        DENIS R. HURLEY, U.S.D.J.